**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------X

JENNIFER CARUSO-JONES,

                             Plaintiff,

        - against -

ROYAL BANK OF CANADA

and

RBC CAPITAL MARKETS, LLC

                             Defendants.

-------------------------------------------------------X

Case No. 1:25-cv-9481

**COMPLAINT**

**PLAINTIFF DEMANDS**
**A TRIAL BY JURY**

Plaintiff, JENNIFER CARUSO-JONES, by her attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, hereby complains of the Defendants, ROYAL BANK OF CANADA and RBC CAPITAL MARKETS, LLC (collectively "RBC") upon information and belief, as follows:

<u>**NATURE OF THE CASE**</u>

1. Plaintiff is a 54-year-old woman and an accomplished investment banker who loved her job.

2. Plaintiff built a stellar 23-year career in the industry, including 14 highly successful years with Defendants, rising through the ranks to become a Managing Director in Defendants' Equity Capital Markets Group.

3. Throughout her tenure with Defendants, Plaintiff consistently exceeded expectations and received glowing performance reviews.

4.      Nevertheless, Plaintiff was subjected to sex discrimination by Defendants, in pay, promotion, and terms, conditions, and privileges of employment.

5.      Defendants' campaign of discrimination against Plaintiff included paying her hundreds of thousands less than male comparators, docking her bonus by more than 30% for taking maternity leave, subjecting her to hostile interrogations that triggered disabling health conditions, and ultimately forcing her out while hiring younger males to replace her.

6.      Plaintiff is not the only woman affected by Defendants' discriminatory conduct. Other women experienced similar discriminatory treatment, including suffering the "pregnancy tax" when returning from maternity leave.

7.      The few women still employed in MD roles, reflect the glass ceiling women continue to confront. Apparently indifferent to the situation, six women MDs were separated from employment in 2023 alone.

8.      Not only did Defendants' illegally push Plaintiff out of her job, they compounded the harm by falsely telling others in the industry that she had "retired."

9.      Still today, Plaintiff is being blackballed in the industry, as Defendants purposely block her path to re-enter the industry.

10.     Due to Defendants' discriminatory conduct, including their ongoing tortious interference with her employment prospects, Plaintiff has suffered devastating financial losses, severe emotional distress, and irreparable damage to her 23-year career in investment banking.

11.     Plaintiff brings this lawsuit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., ("Title VII");  the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq*., as amended, ("ADA"); the New York State Human Rights Law, New York State Executive Law §§ 296 *et seq*. ("NYSHRL"); the New York State Labor Law, New

York State Labor Law §§ 215 *et seq*. ("NYLL"); the New York City Human Rights Law, New York City Administrative Code §§ 8-107 *et seq*. ("NYCHRL"); and the New York Common Law, and seeks damages to redress the injuries she has suffered as a result of being discriminated and retaliated against on the basis of her sex, familial status, and disability.

### JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES

12.    This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 42 U.S.C. §2000e-5(f)(3) and 28 U.S.C. §§ 1331, 1332, and 1343.

13.    This Court has supplemental jurisdiction over Plaintiff's claims under the NYSHRL, the NYCHRL, the NYLL, and the New York Common Law pursuant to 28 U.S.C. § 1367.

14.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

15.    Plaintiff (a) filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 12, 2024, and by (b) receiving a Notice of Right to Sue from the EEOC on July 29, 2025, (c) commencing this action within 90 days[1] of the issuance of the Notice of Right to Sue by the EEOC, and (d) contemporaneously with the filing of this Complaint, mailing copies thereof to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York pursuant to the notice requirements of § 8-502 of the New York City Administrative Code, Plaintiff has satisfied all of the procedural prerequisites for the commencement of the instant action. A copy of the Notice of Right to Sue is annexed hereto as **"Exhibit A;"** a copy of the transmittal letter to the NYCCHR *et ano.* is annexed hereto as **"Exhibit B."**

---

[1] The parties executed an agreement on October 1, 2025, tolling the 90-day filing deadline through November 15, 2025.

## PARTIES

16.    Plaintiff is a 54-year-old woman.

17.    Plaintiff is a person with the disabilities of stress-based asthma and claustrophobia which

developed at work.

18.    Plaintiff's disabilities substantially limited her respiratory system, which substantially

limited her activity and ability to travel.

19.    Plaintiff was highly qualified to carry out her job with or without a reasonable

accommodation.

20.    Defendant Royal Bank of Canada ("RBC") is a foreign corporation registered in the State

of Connecticut and is licensed to do business in the State of New York.

21.    Defendant RBC's principal place of business is located at 200 Bay Street, Toronto, Ontario,

Canada.

22.    RBC is the largest bank in Canada.

23.    Royal Bank of Canada is the parent company of RBC Capital Markets LLC ("RBC

Capital" or "the investment bank").

24.    RBC Capital is a foreign limited liability company licensed to do business in the State of

New York, and is headquartered at 200 Vesey Street, 9th Floor, New York, NY 10281.

25.    RBC Capital is a global investment bank that provides banking and financial services.

26.    At all relevant times, Plaintiff was an employee of Defendants.

27.    RBC and RBC Capital each employ over 500 employees.

28.    Throughout her employment with Defendants, Plaintiff worked at RBC Capital's New

York office located at 200 Vesey Street, New York, NY 10281.

## MATERIAL FACTS

### Introduction

29.    Plaintiff worked in investment banking for 23 years, 14 of which were with Defendants.

30.    In 2010, Plaintiff began working for RBC in its Equity Capital Markets Group ("ECM") within the Global Investment Banking division of RBC Capital.

31.    Plaintiff received a base salary plus substantial year-end bonuses, paid part in cash and part in stock, as is typical in investment banking.

32.    Plaintiff's approximate annual total compensation from years 2020–2022 averaged $1,117,000.

33.    In the last three years alone, Plaintiff accrued over 5,232.78 restricted stock units which would be currently valued at over $750,000.

34.    Plaintiff was a stellar performer as demonstrated by her written evaluations and regular praise from colleagues and group heads.

35.    In her 2022 Year End Review, Plaintiff received an "Exceeded Expectations" rating and her supervisor praised her, saying: "She is a highly regarded and valued colleague in our ECM franchise, someone always willing to step up…She brings dedication, high energy, collaboration, and syndicate expertise to our clients and helps navigate the more difficult deals to execute."

36.    Yet, during Plaintiff's employment, she was denied promotions, paid less than her peers, and subjected to inferior terms, conditions, and privileges of employment on the basis of her sex, familial, and disability status.

37.    The discrimination culminated in 2023, when RBC Capital blatantly pushed Plaintiff out of her job and defamed her, causing irreparable damage to her future career prospects.

**Pattern or Practice of Discrimination Against Women Managing Directors at RBC**

38. The discrimination RBC subjected Plaintiff to, as detailed herein, is a part of a pattern or practice of discrimination against women at the Managing Director ("MD") level.

39. RBC Capital has very few women Investment Bankers, averaging around 15% of its workforce.

40. The dearth of women becomes particularly apparent at the MD level.

41. According to RBC Capital's own data, collected up to April 2023, "Just 3 of 42 MD hires since 2020 have been women" in investment banking.

42. This data also shows that in the year 2023, RBC Capital had eight women MDs, compared to 133 men.

43. Stunningly, in 2023, six women who were MDs separated employment with RBC Capital (including Plaintiff).

44. Upon information and belief, most women separating employment from RBC at the upper echelons experienced discrimination based on sex, pregnancy, or disability leave discrimination.

45. For example, one female MD in Plaintiff's group, departed RBC Capital in or around January 2023. Her promotion to MD was delayed by years and she was paid less than comparable males. Moreover, for each of her three maternity leaves, her bonus was prorated. After being demoted, she left.

46. Another female MD in Human Resources ("HR"), separated from RBC Capital in June 2023. This female MD in HR had commiserated with Plaintiff on several occasions regarding Plaintiff's mistreatment by RBC. In fact, this female MD in HR stated to Plaintiff, in sum or substance, "I know they are trying to let you go."

47.  Another female MD head in Global Markets, had been very vocal about the hostile male culture and "boys' club" mentality before departing RBC Capital sometime in the summer of 2023.

48.  Another female MD Co-Head of Loan Capital Markets also complained of the "boys' club mentality" and separated in October 2023.

49.  Lastly, there was another female MD in CME who left suddenly and unexpectedly in October 2023.

50.  The discrimination against women was not confined to the New York City office. Upon information and belief, every Senior woman in Canada's Equity Sales had either left or been pushed out so that there were no Senior women remaining.

51.  Similar separations occurred the year prior such as a female MD who discovered she was being underpaid vis-à-vis the men in her group and separated in 2022.

52.  Other females at the MD or Director level separated employment in 2021-2022, including two Directors, an MD in the Equity Capital Markets Group, and an MD in the Head of Business Development Group. In particular, the MD in the Head of Business Development Group had gone to bat for senior women on several occasions due to unfair treatment by RBC.

53.  Plaintiff was a member of "R Women," a group formed for the purpose of promoting opportunities for women to work together, mentor each other, navigate the mostly male work environment, and maintain a work/life balance.

54.  Plaintiff's participation in R Women confirmed the data reflecting sex discrimination and allowed her to hear women's discrimination complaints firsthand.

**Promotion Discrimination**

55.    Throughout her 13.5 years at RBC, Plaintiff was a dedicated employee who performed exceptionally well.

56.    As such, Plaintiff received stellar performance reviews and was promoted up the ranks.

57.    Still, Plaintiff was denied promotions because she was a woman.

58.    In 2015, Plaintiff was promoted to Managing Director, the top rung at the investment bank.

59.    That Plaintiff was still not treated equally was clear when RBC held a special event in Toronto for all newly promoted Managing Directors to see presentations and network with other Managing Directors. When Plaintiff went to sign up, she was told the event had reached "maximum capacity" and she therefore could not attend. Emails were exchanged that reflect this incident.

60.    On several occasions, Plaintiff complained about not being considered, interviewed, or promoted when there were openings for which she was clearly qualified.

61.    For example, a white male was brought in as Head of Syndicate in 2016.

62.    This white male held the exact same position at Deutsche Bank that Plaintiff held at RBC and his qualifications for the position were equal to hers.  Despite this, Plaintiff was not even interviewed.

63.    This white male was hired in at a salary that was approximately 55% more than Plaintiff's compensation.

64.    In addition, on three separate occasions, there was an opening to run the Syndicate Desk.

65.    In each case, Plaintiff was asked to step in and cover the desk while the position was vacant, which she willingly did.

66.    During these periods Plaintiff essentially managed two jobs exceptionally well but was not provided additional compensation.

67.    Moreover, Plaintiff was never considered or interviewed for the role on any of these three occasions.

68.    The Head of the Syndicate Desk was paid substantially more than Plaintiff.

69.    Other women at the investment bank, including some of those listed above, were similarly discriminated against in the denial and delayed timing of their promotions.

**Pay Discrimination**

70.    Plaintiff was also paid less than her similarly situated male colleagues, while delivering performance that was equal to or better than their performance.

71.    For instance, once an MD, it took a significant number of years before Plaintiff reached the $1 million point in total compensation – a benchmark in the industry – while comparable male MDs achieved that benchmark quickly.

72.    In order to calibrate compensation to stay competitive and abreast of the market, RBC Capital regularly surveyed the market to see how much comparable firms compensate particular positions and would adjust pay accordingly (known as "street comparisons").

73.    Plaintiff's total compensation in 2019 through 2022 was paid hundreds of thousands less than market comparators, all male, holding the same position at comparably sized banks.

74.    Other women at the investment bank, including those listed above, were similarly discriminated against in compensation.

**Pregnancy Discrimination**

75.    RBC Capital regularly subjects new mothers to a "pregnancy tax" which is discriminatory.

76.     Sometime in 2019, Plaintiff was told that RBC Capital implemented a new policy ensuring women's bonuses would not be prorated upon returning from maternity leave.

77.     According to RBC's Head of Equities at the time, the firm did not prorate bonuses, but explained that for some reason, the managers in investment banking – Plaintiff's division – continued to engage in prorating women.

78.     In 2019, when Plaintiff returned from her maternity leave, her compensation was docked by more than 30%.

79.     The maternity leave policy provided to Plaintiff specifically states that a woman's bonus will be docked if she takes maternity leave.

80.     The maternity policy states: "Maternity leaves of up to 16 weeks will impact bonus, benefits and services as follow... The incentive bonus will be prorated based on the length of leave..." **(See Exhibit C)**.

81.     Importantly, RBC's disability policy does not dock pay for leave.

82.     Plaintiff complained to the Head of Equities to no avail.

83.     However, knowing such practices were illegal and a violation of RBC's stated new policy, the Head of Equities expressed fear that such information could be discovered by the media.

84.     Plaintiff also complained to a Human Resources representative, providing her a document showing that RBC was out of step with maternity/bonus related policies around the street.

85.     Other women, including several of those listed above, were similarly docked pay upon returning from maternity leave.

86.    Just six months ago, on May 1, 2025, while hosting an event for the Women's Syndicate, Plaintiff was informed by an employee at RBC Capital that the firm had recently updated its maternity leave policy, which had just gone into effect.

87.    The updated policy provides clear non-discriminatory benefits for new parents.

88.    RBC Capital has also hired a full-time staff member responsible for managing all maternity leave matters, with the goal of preventing future issues.

89.    Upon information and belief, these policy updates were implemented after Plaintiff and others complained about pregnancy discrimination at RBC Capital. The changes reflect RBC Capital's acknowledgement of its past history of pregnancy discrimination.

**Hostile and Abusive Treatment During an SEC Investigation**

90.    In 2022, Plaintiff was subjected to a hostile work environment.

91.    Pursuant to an SEC investigation of RBC Capital's practices related to confidential material, Plaintiff was subjected to abusive interrogation from criminal lawyers that were hired on behalf of RBC.

92.    The mistreatment of Plaintiff was so severe that others commented on it, but no one in ECM took any action to stem the abuse.

93.    Plaintiff was not accused of any wrongdoing and RBC Capital was later cleared of any wrongdoing.

94.    Upon information and belief, some similarly situated male colleagues were not subjected to intimidation and hostile questioning regarding the matter under investigation.

95.    Plaintiff complained to the female MD in HR explaining the way she had been treated and the toll it was taking on her health.  The female MD in HR, without taking steps to investigate her complaint, instead advised her to take a disability leave.

96.    Months later, *on the first day back from leave*, Plaintiff was told she was to be "interviewed" again related to emails Plaintiff had sent during the time of the previous investigation, insinuating she was sending coded messages.

97.    As no wrongdoing whatsoever was found against Plaintiff previously, the concerns and requests for more interviews appeared to be a trumped up way to harass her.

98.    As such, the campaign of harassment to force Plaintiff out of her job began the day of her return.

99.    The hostile and abusive treatment Plaintiff endured took a heavy toll on her health.

**Discrimination based on Sex, Caregiver Status, Disability and Retaliation**

100.    Plaintiff developed stress-based asthma and claustrophobia, with each medical condition exacerbating the other, leading to Plaintiff needing a four-month disability leave.

101.    While on disability leave, a member of her group called her saying he wanted to check up on her. He proceeded to ask her, in sum or substance, "How much paid time off would you need to be granted in exchange for not coming back to work at all based on disability?"

102.    Plaintiff was shocked by the inquiry and made clear that she had every intention of returning to work as scheduled.

103.    By the time Plaintiff returned to her job in May 2023, she was reporting directly to John Kolz ("Kolz"), Head of US ECM, Co-Head of Global ECM.

104.    During the summer of 2023 Joe Passaro ("Passaro"), was hired as head of US Syndicate and also became her supervisor.

105.    Everyone else in Plaintiff's group participated in Passaro's hiring except for Plaintiff, who was purposely excluded.

106. Under the new managers, a blatant "Old Boys' Club" environment had taken hold and flourished.

107. For instance, Plaintiff's male managers and colleagues frequently left early to go on golf outings to which Plaintiff was not invited.

108. Plaintiff was also not invited to sporting events or to have drinks while her colleagues and peers were invited regularly.

109. While Plaintiff was hoping to hit the ground running after her return, she quickly came to realize that she was being discriminated against as a woman and for having availed herself to disability leave.

110. Plaintiff began to be treated in specific ways designed to impede her ability to successfully carry out her job.

111. From the moment Plaintiff returned from disability leave, Passaro and John Hoffman ("Hoffman"), who was now Co-Head of one of the sectors she was responsible for, avoided interacting with her and their wholly dismissive treatment of Plaintiff never abated.

112. For instance, Plaintiff sought a meeting with Passaro and Hoffman to develop a proactive and regenerative plan for her role in ECM, yet she was ignored.

113. Kolz also avoided and ignored Plaintiff.

114. The managers' intentional conduct was meant to humiliate her, impede her business opportunities, and make her so uncomfortable in the workplace that she would quit.

115. Plaintiff knew RBC was telegraphing that her days at RBC Capital were numbered.

116. Plaintiff's trepidation grew as she discovered that she was purposely being isolated from other managers and peers and being excluded from day-to-day business.

117. Plaintiff soon discovered she was also being excluded from client dinners and calls.

118. Plaintiff was also excluded from investor meetings – for example, meetings held with Capital, Millennium, and from a trip to Boston with Fidelity and Wellington. She was also excluded from several client meetings held in Chicago.

119. Shockingly, less than two months after returning from leave, in mid-July 2023, Hoffman and other MDs began excluding her from their office communications. These messages pertained to equity capital market deals and other pertinent information to the team – information she should have, and always had been, included in.

120. Noting Plaintiff's name absent from communications, colleagues forwarded her the electronic messages she was excluded from, and as such, Plaintiff has multiple examples in her possession.

121. Plaintiff was further isolated by obstructing her participation in interviews occurring with potential new hires, all men. Previously she had played a central role in hiring.

122. Plaintiff was acutely aware of this change, as while on leave, she inadvertently discovered that RBC was actively interviewing candidates for execution positions and had hired a young white male to work alongside Passaro as his "wing-man" on block trades.

123. Plaintiff was also made aware of two other male counterparts that had been in dialogue with Passaro and others, for a position on the execution side.

124. Passaro's discriminatory hiring practices were confirmed when he openly stated, in sum or substance, that he was seeking to hire "a young guy, who has no family ties, that is fine with going out every night for drinks or dinner and is eager to do so."

125. On or around October 2, 2023, Passaro moved a female employee's seat, explaining that he needed to make room for "his boy" to sit right next to him.

126.    The "boy" was a young male with minimal relevant experience, but was nevertheless brought in as a Director, and most likely to take over Plaintiff's job.

127.    Around the same time, her managers were also interviewing other less experienced men for her desk.

128.    Plaintiff complained to her group head, John Kolz, setting forth what she knew about the interviews and conversations taking place via a headhunter and word-of-mouth, but nothing changed.

129.    Soon after, Plaintiff was told that she was to expect a reduced bonus at year-end due to the "recent changes and new hires" in the group.

130.    In the industry, reducing one's bonus is a clear communication that you are being pushed out.

131.    Kolz stated to Plaintiff, in a stunning admission, that she "was not part of Joe's [Passaro] vision."

132.    Plaintiff complained to Human Resources and explained how she was being excluded. Human Resources acknowledged knowing that "they" were trying to push her out.

133.    Plaintiff complained to Kolz on several occasions that she was being cut off from the business, purposely being excluded, and not utilized.  Kolz did not deny her accusation.

134.     In the same time period, Kolz held a meeting with Plaintiff, telling her that she should "think about the next stage of her career."  He suggested she "think of something [she] loved to do."

135.    Kolz stated in sum or substance, "What about Dawn's job, doing a business manager type role. Or something else outside of the group." Such a job would constitute a demotion as Kolz was aware.

136.    Kolz explained his comments and queries by saying, in sum or substance, that he was trying to make it easier for her considering "…your 4-year-old, the commute, and your health."

137.    Kolz utilized this paternal "looking out for her best interest" schtick during multiple conversations where he attempted to coerce her out of her job.

138.    Plaintiff was taken aback by Kolz's comments and began to confront the reality that he was telegraphing: she was no longer wanted at RBC Capital.

139.    She also realized this discriminatory treatment was not based on her performance, but because of her sex, caregiver status, disability, and return from leave.

140.    After making crystal clear that she loved her job and had no interest in leaving, Kolz continued a manipulative campaign to get Plaintiff to resign.

141.    In another stunning admission, Kolz told her outright that "they" wanted her departure to be amicable.

142.    Kolz's coercion and harassment was devastating and humiliating for Plaintiff.

143.    Plaintiff felt degraded to be treated in this way, especially after all the years and commitment she had put into RBC.

144.    Kolz then began speaking to Plaintiff about a planned RIF coming in September.  Kolz said he did not plan to make her a part of the RIF but suggested she could get a good package on which to depart with.

145.    Kolz attempted to guilt Plaintiff by saying that her leaving could potentially be saving someone else's job.

146.    By this point, Plaintiff knew she was going to be terminated – the decision had clearly already been made – on discriminatory bases.

147.    Plaintiff also knew the unlawful treatment was harming the career she loved.

148.  Plaintiff feared that if she did not cooperate, her career and reputation would be further damaged and she would be left with nothing.

149.  Overwhelmed by the harassment and threat, Plaintiff felt overwhelming defeat.

150.  Kolz ongoing conduct sent Plaintiff the clear message that if she did not leave voluntarily, she would be outright terminated, losing all of her bonus and unvested stock.

151.  Concerned about incurring the least amount of damage to her finances and career, Plaintiff spoke to Kolz about "the voluntary separation" options such as the RIF.

152.  Kolz made promises to Plaintiff about ensuring she would receive a better separation package than those who had been part of the RIF, including a payout of her bonus as the year end was just weeks away.

153.  It was agreed that Plaintiff could review the potential offer before making any decisions.

154.  Kolz stated that he would have the Senior HR Business Partner contact her about the special package she would be presented to leave as he didn't know the exact bonus formula that would be used for a severance.

155.  Plaintiff ascertained that RBC Capital needed her departure to be distinguished from the RIF because it would be problematic – legally and appearance-wise – to have another female MD cut from the ranks that year.

156.  While Plaintiff waited to hear from Schulz, she continued to be excluded from communications and business, impeding her ability to work effectively.

157.  The clear understanding was that she would first need to know the monetary offer before agreeing to resign. She did not, a priori, agree to voluntarily separate from RBC Capital.

158.  This fact is memorialized in a voice recording made on October 16, 2023, where Schultz explains the package being offered to her.

159. On the call, Schultz reveals that Plaintiff would only be provided 40-42% of her bonus already earned that year.

160. Plaintiff objects to that amount and explains that Kolz had promised a better offer.

161. Plaintiff goes on to tell Schultz that she has made clear that if the package is not good, she would like to continue her job, applying herself 110% as always.

162. On October 17, 2023, Schultz sends Plaintiff the written offer which reflecting the terms represented in the previous day's call, including the inexplicable 60% reduction of her 2023 year-end bonus.

163. Plaintiff did not accept the offer but was terminated nonetheless.

**Discriminatory Messaging and Defamation During Her Termination**

164. On November 03, 2023, RBC Capital sent out an email to her team inaccurately explaining her departure even though Plaintiff did not consent. The message falsely suggested that Plaintiff's separation was voluntary and unnecessarily emphasized her age.

165. In addition, RBC Capital falsely told industry associates and clients that Plaintiff had retired.

166. Messages and phone calls Plaintiff received from colleagues in the industry confirm that RBC Capital continued to spread the lie that Plaintiff had retired.

167. A voice message left on Plaintiff's phone on December 11, 2023, at 10:09 a.m. says: "…we tried to get a hold of you and they said you retired…"

168. RBC Capital's statements were untrue, as Plaintiff had planned to continue work in the banking industry.

169. RBC Capital has made similar communications and sent similar messages upon the separation of other women MDs.

170.   RBC Capital has also made the false representation on Plaintiff's official regulatory U5 form that the reason for Plaintiff's departure was "position elimination" in an effort to cover-up the forced termination.

**Blacklisting and Retaliatory Interference with Employment Opportunities**

171.   Plaintiff's employment prospects have been adversely affected by RBC Capital's disparaging remarks concerning both her professional and personal character, made during communications with prospective employers.

172.   For example, an investment banking firm based in New York had been aggressively working on recruiting Plaintiff for a job.

173.   Plaintiff entered formal discussions about a position with this firm in June 2024.

174.   Plaintiff and the investment banking firm engaged in ongoing discussions regarding her professional qualifications for weeks.

175.   On September 17, 2024, Plaintiff participated in a formal interview with three individuals at the investment banking firm's office: the Managing Director of Equity Capital Markets; a Managing Partner; and the Chief Operating Officer.

176.   On September 30, 2024, Plaintiff spoke with a Managing Partner, who praised her interview performance and confirmed she was the sole candidate currently being considered for the Managing Director of Equity Markets position at the investment banking firm.

177.   Plaintiff was subsequently invited to visit the investment banking firm's office a second time on October 7, 2024. At the firm's request, she also spoke with a former employee, who provided insight into what it would be like to work for the firm.

178.    On December 20, 2024, the Managing Partner extended a verbal offer to Plaintiff on behalf of the firm and reiterated his strong desire for her to join the firm.

179.    Subsequently, on January 13, 2025, Plaintiff informed the investment banking firm that she wished to proceed with the opportunity and requested to finalize the terms of the offer. However, the Managing Partner suddenly became unresponsive, offering various excuses and failing to move the process forward.

180.    Plaintiff later learned through conversations with industry associates that the Managing Partner and Managing Director of the Head of Equities had traveled to San Francisco to attend the JPM Conference – an industry-standard healthcare conference attended by virtually every bank.

181.    This information immediately raised concerns for Plaintiff, as she realized those men likely encountered representatives from RBC Capital at the JPM Conference – potentially jeopardizing her candidacy with the investment banking firm.

182.    Plaintiff's concerns were confirmed during a January 23, 2025, phone call during which the investment banking firm Head of Equities directly asked, "Let me ask you a question: is there any reason why firms would not want to do business with us if you joined [the investment banking firm]?"

183.    Plaintiff responded, in sum and substance, "The only firm that I would not be able to help with is RBC Capital. Clearly there is not a great relationship there."

184.    On February 5, 2025, just two weeks later, Plaintiff was officially informed that her verbal offer had been rescinded. One of the firm's Managing Partners offered a series of shifting justifications for the decision, including an ongoing lawsuit, a hiring freeze, and unfavorable market conditions.

185. Plaintiff went on to experience another sudden eerily similar withdrawal of a promising employment opportunity around the same time period.

186. On December 6, 2024, while Plaintiff was hosting the 2024 Women's Syndicate Holiday Event, she was approached by the Co-Head of Capital Markets of another investment bank, regarding an opportunity to join his firm.

187. Throughout January 2025, Plaintiff and the Co-Head remained in contact, discussing her professional background and qualifications. They made a plan to meet for lunch to further explore the opportunity.

188. On February 7, 2025, Plaintiff and the Co-Head met for their scheduled lunch, during which he told Plaintiff she would be an excellent fit for the investment bank, stating that she could "bring [the firm] to the next level with accounts and issuers."

189. He also discussed that he would want Plaintiff to come into the New York City office three days week and had discussions with her on the firm's pay structure.

190. At the end of the meeting, the Co-Head stated that he wanted to move forward with her candidacy quickly and promised to connect Plaintiff with the firm's Partners.

191. Subsequently, Plaintiff began preparing for the interview with the firm's Partners, some of whom Plaintiff has known for several years.

192. On February 26, 2025, Plaintiff attended a Partner meeting at the firm's offices, where she met the President, the Chairman and CEO, the Co-Heads of Investment Banking, and a Co-Head of Capital Markets.

193. Each Partner expressed enthusiasm and saw Plaintiff as a "perfect fit."

194. During the meeting, Plaintiff was asked about her departure from RBC Capital. Plaintiff explained that she left RBC following organizational restructuring and staffing changes.

195.    One of the Partners then mentioned to Plaintiff that he was close friends with Matthew Stopnik, Head of Global Investment Banking at RBC Capital.

196.    Plaintiff immediately became concerned, as she had begun to suspect her former bosses were speaking ill of her.

197.    Nonetheless, the meeting ended on a positive note. Plaintiff was told that all the Partners loved her and were excited about her working for the firm.

198.    On March 3, 2025, Plaintiff followed up with a list of questions on the position.

199.    Plaintiff then became aware that the Co-Head spoke with a former colleague from RBC Capital Markets, to verify the circumstances surrounding Plaintiff's departure from RBC Capital.

200.    On March 17, 2025 – just two weeks later – the Co-Head contacted Plaintiff in a markedly different tone, stating that due to the market "being crazy right now," the firm would be placing its hiring efforts on hold and waiting to reassess at a later time.

201.    Following that communication, Plaintiff did not hear from anyone at this firm again.

202.    Despite Plaintiff's two decades of banking experience, she has been unable to secure employment due to the defamatory and discriminatory communications by RBC Capital.

203.    Since then, Plaintiff has heard confirmation that RBC Capital is purposely interfering with her job by telling prospective employers false information.

204.    In such a small and interconnected industry, this treatment is likely to persist, posing substantial challenges to Plaintiff's ongoing job search and efforts to support her family.

## **HARM TO PLAINTIFF**

205.    As a result of RBC's discriminatory actions, Plaintiff has experienced severe emotional distress and physical harm that continues today.

206.    Plaintiff's disability symptoms, for which she had gotten under control during her leave, returned and were exacerbated by the hostile work environment and discriminatory treatment.

207.    Plaintiff sought treatment for her symptoms and continues to be treated today.

208.    The discrimination that Plaintiff has endured has done irreparable harm to her reputation and career.

209.    Defendants' false, defamatory comments that Plaintiff retired has harmed her reputation and hindered her ability to find comparable employment in the industry.

210.    As a result of the acts and conduct complained of herein, Plaintiff has suffered, and will continue to suffer, loss of income, loss of a salary, bonuses, benefits, and other compensation which such employment entails.

211.    Plaintiff has also suffered future pecuniary losses and emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

212.    RBC's conduct was intentional for the purpose of harming Plaintiff.

213.    As a result of the above, Plaintiff has been damaged in the amount in excess of the jurisdiction of the Court.

214.    Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

215.    As such, Plaintiff demands punitive damages.

## AS A FIRST CAUSE OF ACTION
### DISCRIMINATION UNDER TITLE VII

216.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

217.    Plaintiff complains that Defendants violated Title VII's prohibition against discrimination in employment based, in whole or in part, upon Plaintiff's sex (female).

218.   42 U.S.C. §§ 2000e-2 states:

>   It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to him compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, **sex**, or national origin…

219.   Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §§ 2000e by discriminating against Plaintiff because of her sex (female).

### AS A SECOND CAUSE OF ACTION
### RETALIATION UNDER TITLE VII

220.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

221.   42 U.S.C. §§ 2000e-3 states:

>   It shall be an unlawful employment practice for an employer to discriminate against any of him employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by the subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the subchapter.

222.   Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §§ 2000e-3 by retaliating against Plaintiff for complaining of the aforementioned violations and for going on disability leave.

### AS A THIRD CAUSE OF ACTION
### DISCRIMINATION UNDER THE NYSHRL

223.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

224. New York State Executive Law § Executive Law § 296 provides that,

> It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's … **sex**, **disability** … **familial status**… to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

225. Defendants engaged in unlawful discriminatory practices in violation of the New York State Executive Law § 296(1)(a) by discriminating against Plaintiff because of her sex, familial status, and/or disability.

### AS A FOURTH CAUSE OF ACTION
### RETALIATION UNDER THE NYSHRL

226. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

227. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice:

> For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article.

228. Defendants engaged in an unlawful discriminatory practice by retaliating and otherwise discriminating against the Plaintiff because of her opposition to her employer's unlawful employment practices and for going on disability leave.

### AS A FIFTH CAUSE OF ACTION
### RETALIATION UNDER THE NYLL

229. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

230. New York State Labor Law § 215 provides that:

> No employer or his or her agent, or the officer or agent of any corporation, partnership, or limited liability company, or any other person, shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee…. because such employee has used any legally protected absence pursuant to federal, local, or state law.

231. Defendants engaged in unlawful discriminatory practices by retaliating against Plaintiff because of her opposition to the unlawful employment practices of Defendants and in retaliation for going on disability leave.

**AS A SIXTH CAUSE OF ACTION**
**DISCRIMINATION UNDER THE NYCHRL**

232. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

233. The Administrative Code of City of NY § 8-107 (1) provides that:

> It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived …**gender…disability…caregiver status…** to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

234. Defendants engaged in unlawful discriminatory practices in violation of the Administrative Code of City of NY § 8-107 [1] by discriminating against Plaintiff because of her sex, caregiver status, and/or disability.

**AS A SEVENTH CAUSE OF ACTION**
**RETALIATION UNDER THE NYCHRL**

235. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

236.   The Administrative Code of City of NY § 8-107 (6) forbids retaliation for engaging in protected activity.

237.   Defendants engaged in an unlawful discriminatory practice by retaliating, and otherwise discriminating against the Plaintiff because of her opposition to her employer's unlawful employment practices and for going on legally protected leave.

## AS AN EIGHTH CAUSE OF ACTION
## DISABILITY DISCRIMINATION UNDER THE ADA

238.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

239.   Plaintiff is a person with the disabilities of asthma and claustrophobia.

240.   Plaintiff claims Defendant violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336), as amended, as these titles appear in volume 42 of the United States Code, beginning at Section 12101.

241.   Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112 "Discrimination" states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

242.   Defendants engaged in unlawful discriminatory practices by treating Plaintiff hostilely, denying her equal terms, conditions and privileges of employment and forcing her termination.

243.   Defendants engaged in unlawful discriminatory practices by forcing Plaintiff out of her job because of Plaintiff's disability, disability related leave, and requests for an accommodation.

## AS A NINTH CAUSE OF ACTION
### RETALIATION UNDER THE ADA

244.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this Complaint.

245.  42 U.S.C. § 2000e-3(a) states that it shall be an unlawful employment practice for an

employer:

> (1) to . . . discriminate against any of his employees . . . because [s]he
> has opposed any practice made an unlawful employment practice by
> this subchapter, …

246.  The above section forbids retaliation for engaging in protected activity such as requesting a

reasonable accommodation and going on a disability related leave.

247.  Defendants engaged in unlawful discriminatory practices treating Plaintiff hostilely,

denying her equal terms, conditions and privileges of employment and forcing her

termination because in retaliation for the protected activity of requesting a reasonable

accommodation for her disability and utilizing disability related leave.

### AS A TENTH CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

248.  Plaintiff repeats, reiterates, and realleges each and every allegation made in the above

paragraphs of this Complaint as if more fully set forth herein at length.

249.  Defendants have intentionally interfered with and continue to intentionally interfere with

and disrupt Plaintiff's prospective employment opportunities following the end of Plaintiff's

employment with Defendants.

250.  Defendants have intentionally and wrongfully defamed Plaintiff and have harmed her

reputation among similarly situated employers and recruiting companies.

251.  As a result of said conduct, Plaintiff's career and reputation will forever be ruined, which entitles Plaintiff to the maximum allowable damages under this statute and an award of punitive damages.

## JURY DEMAND

252.  Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants as follows:

A.   Declaring that Defendants engaged in unlawful employment practices prohibited by the Title VII, the NYSHRL, NYLL, NYCHRL the ADA, and the New York Common Law in that Defendants discriminated and retaliated against Plaintiff because of her sex, familial status, and disability and caused harm and damage to her reputation and career prospects;

B.  Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and retaliation and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C.  Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D.  Awarding Plaintiff punitive damages;

E.  Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action;

F.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.


Dated:  New York, New York
         November 13, 2025

**PHILLIPS & ASSOCIATES,**
**ATTORNEYS AT LAW, PLLC**

By:

Michelle A. Caiola, Esq.
Jonathan Trinidad Lira, Esq.
*Attorneys for Plaintiff*
45 Broadway, 28th Floor
New York, New York 10006
T: (212) 248 – 7431
F: (212) 901 – 2107
mcaiola@tpglaws.com
jtrinidadlira@tpglaws.com

30